UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Kelly M. Crawford, as Receiver of TRADERS DOMAIN FX LTD, d/b/a, TRADERS DOMAIN, et al., <br><br> Plaintiff, <br><br> v. <br><br> FIRST CLASS CONSULTING, LLC; TRUSTEE OF THE HOSEA CONSULTING TRUST; KEVTON TECHNOLOGIES LLC; BRIAN TRI LE; THEODUS D. LOWE; VI CHU HO; VU T. NGUYEN; CHOOSE TO WIN VENTURES, LP; THE RESERVE AT HIGHLAND HEIGHTS, LLC; THOANG BUI, as successor to TINMAN DEVELOPMENT, LLC; and NEW AGE CEO'S MANAGEMENT CORP. <br><br> Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § § § CASE NO. _____ |

### COMPLAINT

Court-appointed Receiver[1], Kelly M. Crawford, Esq. (the "Receiver" or "Plaintiff"), files

this Complaint against Defendants First Class Consulting, LLC, Trustee of the Hosea Consulting

Trust, Kevton Technologies, LLC, Brian Tri Le, Theodus D. Lowe, Vi Chu Ho, Vu T. Nguyen,

---

[1] The United States District Court for the Southern District of Texas appointed Mr. Crawford as Receiver in an enforcement action brought by the Commodity Futures Trading Commission. *See paragraphs 1 and 2 and Exhibits A and B, infra.*

---

**COMPLAINT**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**PAGE 1**

Choose to Win Ventures, LP, The Reserve at Highland Heights, LLC, Thoang Bui, also known as "Tommy" Bui, successor in interest to Tinman Development, LLC, and New Age CEO's Management Corp. (collectively referred to herein as "Defendants"), and states:

## PROCEDURAL HISTORY

1.     On September 30, 2024, the Commodity Futures Trading Commission ("CFTC") filed a Complaint for Injunctive Relief and Demand for Jury Trial (the "CFTC Complaint") against Traders Domain FX LTD. d/b/a/ The Traders Domain ("Traders Domain"); Ares Global Ltd. d/b/a/ Trubluefx ("Ares"); Fredirick Teddy Joseph Safranko a/k/a Ted Safranko ("Safranko"); David William Negus-Romvari ("Negus-Romvari"); Algo Capital LLC ("Algo"); Algo FX Capital Advisor, LLC, n/k/a Quant5 Advisor, LLC; Robert Collazo, Jr. ("Collazo"); Juan Herman a/k/a JJ Herman ("Herman"); John Fortini ("Fortini"); Steven Likos ("Likos"); Michael Shannon Sims ("Sims"); Holton Buggs, Jr. ("Buggs"); Centurion Capital Group, Inc. ("Centurion"); Alejandro Santiestaban a/k/a Alex Santi ("Santi"); Gabriel Beltran ("Beltran"); and Archie Rice ("Rice") (collectively, the "Receivership Defendants"), in the United States District Court for the Southern District of Florida (the "Receivership Court"), Case No. 24-CV-23745-RKA (the "CFTC Action"). A copy of the CFTC Complaint is attached hereto as **Exhibit A**.

2.     On October 3, 2024, the Receivership Court in the CFTC Action entered an Order granting the CFTC's Motion for Statutory Restraining Order, Appointment of a Temporary Receiver, and Other Equitable Relief (the "SRO"). A true and correct copy of the SRO is attached hereto as **Exhibit B**. The SRO appointed Kelly Crawford as the Receiver of the assets of the Receivership Defendants in that lawsuit and authorized the Receiver to institute lawsuits to recover assets. *See* SRO ¶¶30(b), (h). The SRO was continued in effect pursuant to preliminary injunctions

entered as to each of the Receivership Defendants named in the CFTC Complaint (collectively, the "PI Orders").

3.      On March 13, 2026, the Receivership Court entered an Order on Motion to Expand Receivership (the "Expansion Order") [ECF No. 425 in the CFTC Action] granting the Receiver's motion to expand the Receivership Estate to encompass the following entities:  Block Consulting Services, LLC, MAS Capital Investments, LLC ("MAS Capital"), Alpha Trader Firm, LLC, Profit Over Everything, Inc., Centurion TS Holdings, LLC, GMJ Marketing, LLC, Go Long Investments, LLC ("Go Long"), The Nutrition Zone, LLC, Intelligenza, LLC, and JVL Consulting, LLC.  See **Exhibit C** attached hereto.

4.      The SRO, PI Orders, and Expansion Order, are collectively referred to as the "Appointment Orders."

5.      The Receiver was also previously appointed as receiver in a related enforcement action arising in the U.S. District Court for the Southern District of Texas, styled *Commodity Futures Trading Commission v. Marcus Todd Brisco, et al.*, Case No. 4:23-cv-0036 (the "Texas Action"). The defendants in the Texas Action included, among other individuals and entities, Tin Quoc Tran.

6.      On March 30, 2026, the Court in the Texas Action entered an order finding that: (i) certain entities owned and controlled by Tran were included within receivership, including MTT9 Holdings, LLC ("MTT9"), SAEG Capital Ltd. ("SAEG"), SECAP Holdings, LLC ("SECAP"), and SACAP Holdings, LLC ("SACAP"), (ii) the assets of such entities were subject to the SRO in the Texas Action, and (iii) the Receiver, in his capacity as receiver in the Texas Action, was authorized to execute an assignment of his interests in MTT9, SAEG, SECAP and SACAP to the CFTC Action Receiver. *See* Texas Action at ECF No. 230.

---

**COMPLAINT**                                                                          **PAGE 3**

7.   The Receiver assigned his interests in MTT9, SAEG, SECAP, and SACAP, including without limitation, the ability to pursue all claims or causes of action held by or against MTT9, SAEG, SECAP, and SACAP to the receivership in the CFTC Action (the "Assignment"). *See* **Exhibit D** at p. 2 attached hereto.

8.   SAEG, SACAP, SECAP, and MTT9 are collectively hereinafter referred to as the "Receivership Entities."

9.   The Receiver's mandate under the SRO is to, *inter alia*, take possession, custody and control of all the assets of the Receivership Entities, collect funds due to the Receivership Entities, obtain documents and records pertaining to the assets, transactions and business operations of the Receivership Entities, and perform all acts necessary to preserve the value of the Receivership Estate. *See* SRO ¶¶ 30(b)-(g).

10.   The Receiver is also authorized to initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any actions or proceedings the Receiver deems necessary and advisable to preserve or increase the value of the Receivership Estate. *Id.* at ¶ 30(h).

## THE PARTIES

### The Receiver

11.   Plaintiff, Kelly M. Crawford, was appointed by the Receivership Court as Receiver over the Receivership Defendants in the CFTC Action. Plaintiff brings this action in his capacity as Receiver pursuant to the authority granted by the Receivership Court in the SRO, each of the Appointment Orders entered in the CFTC Action, and the Assignment from the Receiver in the Texas Action.

**The Defendants**

12.    Defendant First Class Consulting, LLC ("FCC") may be served with process by serving Frank Chen, Manager, 13803 Royal Ridge Drive, Pearland, Texas, or its registered agent Registered Agents, Inc., at 5900 Balcones Drive, Suite 100, Austin, Texas 78731, or wherever either may be found.

13.    Defendant Trustee of the Hosea Consulting Trust ("Hosea") may be served with process by serving Leland Milward at 200 Cheyenne Road, Montgomery, Texas 77316.

14.    Defendant Kevton Technologies, LLC ("Kevton") is a Texas limited liability company that may be served with process by serving its Manager and Registered Agent Nhan Bui at 8030 West Little York, Houston, Texas 77040, or wherever he may be found.

15.    Defendant Brian Tri Le ("Le") may be served with process at 1031 Sugar Lakes Drive, Sugarland, Texas 77478.

16.    Defendant Theodus D. Lowe ("Lowe") may be served with process at 8819 Stowe Creek Lane, Missouri City, Texas 77459, or wherever he may be found.

17.    Defendant Vi Chu Ho ("Ho") may be served with process at 1413 Swayze Street, Magnolia, Texas 77354, or wherever he may be found.

18.    Defendant Vu T Nguyen ("Nguyen") may be served with process at 6609 Basil Woods Way, Houston, Texas 77055, or wherever he may be found.

19.    Defendant Choose to Win Ventures, LP ("Choose to Win") may be served with process by serving its Owner David O. Imonitie Jr. at 1409 Post Oak Blvd., Unit 2304, Houston, Texas 77056.

20.    Defendant The Reserve at Highland Heights, LLC ("The Reserve"), is a Texas limited liability company and may be served by serving its Registered Agent Nhan Bui at 2880

Romano Lane, League City, Texas 77573, or by serving its Manager Tommy Bui at 2880 Romano Lane, League City, Texas 77573, or wherever they may be found.

21.    Defendant Thoang Bui, also known as Tommy Bui, successor in interest to Tinman Development, LLC, now dissolved ("Tinman") may be served at 2880 Romano Lane, League City, Texas 77573, or wherever he may be found.

22.    Defendant New Age CEO's Management Corp. ("New Age") may be served with process by serving its Treasurer and Director Nicole Durio at 15611 Oyster Cove Drive, Sugarland, Texas 77478, or where ever Nicole Durio may be found.

## JURISDICTION AND VENUE

23.    This action is related to the claims in the CFTC Action, over which the Receivership Court has original jurisdiction pursuant to Title 28, U.S.C., Section 1331. This action forms "part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). In addition, pursuant to 28 U.S.C. Section 754, the Receiver filed copies of the CFTC Complaint and the SRO with the Southern District Court of Texas within ten (10) days after the Receiver's appointment that was assigned Miscellaneous Action No. 4:24-mc-01681. A true and correct copy of the Notice of Appointment of Receiver (without exhibits) filed in the Southern District Court of Texas is attached hereto collectively as **Exhibit E**. Accordingly, the Receiver is vested with complete jurisdiction and control of all property subject to the receivership with the right to take possession of such property. Moreover, pursuant to the principles of ancillary jurisdiction or supplemental jurisdiction[2], this Court has supplemental jurisdiction over the claims

---

[2] "Courts have long recognized a federal court's supplemental jurisdiction over actions related to a receivership established in federal court." *See Mandel v. Howard*, 2012 U.S. Dist. LEXIS 43948 (S.D. Fla. Mar. 28, 2012) (collecting cases). This Court has subject-matter jurisdiction over the state-law claims asserted in this complaint in this ancillary proceeding pursuant to 28 U.S.C. §§ 754, 1367 because such claims are ancillary to the CFTC Action, over

**COMPLAINT**                                                                                          **PAGE 6**

set forth herein pursuant to Title 28, United States Code, Section 1367(a). As such, this Court has subject matter jurisdiction over this action.

24.     This Complaint is brought by the Receiver to accomplish the objectives of the Appointment Orders and the Assignment.

25.     The Receiver was appointed in the CFTC Action to accomplish the ends sought and directed by that action, and, as such, he may proceed under this Court's ancillary jurisdiction on claims with no other independent basis for federal jurisdiction. The Receiver, in this action, sues the Defendants, who received money transfers from the subject fraudulent scheme, which is a well-recognized use of the ancillary jurisdiction of the federal courts. *See e.g., Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995) (finding federal ancillary jurisdiction over state law fraudulent transfer claims in an action by a receiver against transferees in a Ponzi scheme case).

26.     The Court has personal jurisdiction over Defendants because each of the Defendants is either a resident of the State of Texas or has its principal place of business in the State of Texas.

27.     The Court also has personal jurisdiction over Defendants because Defendants received funds from the Receivership Entities who were involved in a fraudulent business or business venture in, among other locations, the Southern District of Texas. The monies Defendants

---

which the court in the Southern District of Florida has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction extends from the Southern District of Florida to any judicial district where receivership property is found. This action is properly before this Court under the Court's ancillary jurisdiction because the Receiver brings this action to recover fraudulent transfers and for unjust enrichment relating to money transfers to Defendants made by persons and entities in the Receivership Estate who, as alleged by the CFTC in the Complaint in the CFTC Action, were involved in the operations of a Ponzi scheme. The CFTC Action is within the jurisdiction of the federal court in the Southern District of Florida under 28 U.S.C. § 1331 and this ancillary proceeding in this Court is in furtherance of the Receiver's duties under the orders entered in the CFTC Action.

---

**COMPLAINT**                                                                    **PAGE 7**

received from one or more of the Receivership Entities were proceeds from the fraudulent scheme conducted, in part, in the Southern District of Texas.

28.     Venue is proper in the Southern District of Texas because the Transfers and False Profits described in this Complaint, and other acts described herein, were sent or received in the Southern District of Texas.

29.     All conditions precedent to the bringing of this action have been performed, waived, satisfied, or have otherwise occurred.

## RECEIVER'S STANDING

30.     The Receiver has standing to bring the claims asserted in this Complaint pursuant to the SRO at ¶ 30(h). The SRO authorizes and empowers the Receiver to:

> "initiate…or become a party to any actions or proceedings…that the Temporary Receiver deems necessary and advisable to preserve the value of the Receivership or that the Temporary Receiver deems necessary and advisable to carry out the Temporary Receiver's mandate under this Order."

*Id.* Included among such actions are fraudulent transfer and unjust enrichment actions to recover for the benefit of the Receivership Estate amounts that the Receivership Entities fraudulently transferred to and/or unjustly enriched the Defendants.

31.     The Receiver as a "creditor," and on behalf of the "creditors," of the Receivership Entities, has standing to bring the fraudulent transfer claims asserted in this Complaint under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Section 24.008, Texas Statutes *et seq.* and common law unjust enrichment (pled in the alternative to the fraudulent transfer claims).

32.     Finally, the Receiver has standing to bring this action pursuant to 28 U.S.C. § 754, which provides that "[a] receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall . . . be vested with complete jurisdiction

and control of all such property with the right to take possession thereof [and] shall have capacity to sue in any district without ancillary appointment[.]" As set forth above, the Receiver has complied with the requirements set forth in 28 U.S.C. §§ 754 and 1692.

## LIMITATIONS PERIOD AND APPLICABLE LAW

33.    This action is brought within the pertinent statutory limitations period. Section 24.010(a)(1) of TUFTA provides a four-year period to seek to avoid and recover transfers from the date the transfer was made or, if later, within one year after the transfer was or could reasonably have been discovered by the claimant.

34.    Upon his appointment on October 3, 2024, the Receiver immediately began collecting financial documents including bank statements, wire transfer details, cancelled checks and business records for the Receivership Defendants. Many of the documents were obtained by subpoena from the Receivership Defendants' various banks. The Receiver then promptly forwarded those documents to his forensic accountants who conducted a forensic accounting analysis of the transfers that the Receivership Defendants made to third parties. The Receiver only recently obtained and reviewed that forensic analysis and gained knowledge of Receivership Defendants' transfers to third parties therefrom.

35.    Prior to filing this lawsuit, the Receiver sent to the Defendants a copy of the SRO and requested the Defendant to turn over the false profits they received from the Traders Domain investment scheme. The Defendants ignored the Receiver's letters and failed to provide any response.

36.    The Receiver exercised diligence in investigating and discovering the claims asserted below. Nonetheless, the claims were concealed, and the Receiver was unable to discover or assert the claims until recently. The Receiver did not and could not have discovered the facts

constituting the misconduct of the persons and entities in the Receivership Estate, and the transfers of false profits to Defendants detailed below until after his appointment as Receiver in the CFTC Action, and after bank records were received and examined by the Receiver's forensic accountants.

37.    Further, the Receiver was first appointed receiver over MAS Capital and Go Long pursuant to the Expansion Order on March 13, 2026.

38.    And the Receiver was first appointed Receiver over MTT9, SAEG, SECAP, and SACAP on March 30, 2026.

## FACTUAL ALLEGATIONS

### The Traders Domain Fraudulent Scheme

39.    Traders Domain is a company with its principal operations in Canada. Safranko and Negus-Romvari were the control persons of Traders Domain.

40.    As alleged by the CFTC in the CFTC Action, from at least November 2019 to October 2024 (the "Relevant Period"), Traders Domain fraudulently solicited at least 2,046 U.S. customers to deposit at least $283 million for the purpose of pooled trading of leveraged or margined gold-to-U.S. dollar pair ("XAU/USD") transactions (the "TD Pool"). *See* CFTC Complaint, Exhibit A ¶ 33.

41.    As alleged by the CFTC in the CFTC Action, Traders Domain solicited customers directly and by engaging other individuals and entities ("Sponsors") to solicit customers on its behalf in exchange for commissions equivalent to a percentage, sometimes as high as 60%, of customers' purported trading profits. *See* CFTC Complaint, Exhibit A ¶ 42.

42.    As alleged by the CFTC in the CFTC Action, during the relevant period, Traders Domain made false statements and fraudulent misrepresentations to prospective customers regarding its trading operations and the ability of customers to withdraw their funds. Traders Domain misled customers into believing that all their deposited funds were being invested in

**COMPLAINT**                                                                 **PAGE 10**

XAU/USD when in fact customer funds were being misappropriated and used for other purposes. *See* CFTC Complaint, Exhibit A ¶¶ 46-56.

43. As alleged by the CFTC in the CFTC Action, to conceal their fraud, Traders Domain falsified trading records by manipulating customer trading data such that the daily trading results snapshots sent to customers were nearly always positive. Traders Domain also manipulated trading data to eliminate purported trading losses. And, when customers observed trading losses in their accounts and raised their concerns, Traders Domain falsely claimed (directly or through Sponsors) that such losses were "system errors" or the result of "slippage." *See* CFTC Complaint, Exhibit A ¶¶ 75-78.

44. As alleged by the CFTC in the CFTC Action, when Traders Domain began experiencing "liquidity problems" in August 2022, Traders Domain lied to customers about the purported reasons for delayed withdrawals and made false assurances that withdrawals would eventually be processed. Indeed, Traders Domain lacked the funds to repay its customers because such funds had been misappropriated and not traded as purported, and the Traders Domain fraudulent scheme was on the brink of collapse. *See* CFTC Complaint, Exhibit A ¶¶ 57-71.

45. As alleged by the CFTC in the CFTC Action, Traders Domain misappropriated customer funds by directing customers to deposit funds into third-party bank accounts which were not controlled by Traders Domain or to payment processors contracted by Traders Domain who acted at the direction of Traders Domain. Traders Domain also failed to use at least some customer funds to trade XAU/USD and charged commissions on purported trading profits that did not exist. Traders Domain also misappropriated customer funds by failing to return customer funds despite repeated attempts by thousands of customers to access and/or liquidate their accounts. *See* CFTC Complaint, Exhibit A ¶¶79-89.

---

**COMPLAINT**                                                                 **PAGE 11**

46. Additionally, as alleged by the CFTC in the CFTC Action, Traders Domain misappropriated customer funds by using new customer deposits to make Ponzi-style payments to fund pending withdrawals for certain customers. See CFTC Complaint, Exhibit A ¶¶ 81-83.

### Findings of Fraud in the SRO

47. As a result of the fraudulent conduct outlined above, the CFTC commenced the CFTC Action against the Receivership Defendants, which resulted in the entry of preliminary findings that the Receivership Defendants Santi, Rice, Beltran, Sims, Fortini, Likos, Collazo, and Buggs likely participated in a fraudulent commodities scheme. *See* CFTC Action at ECF Nos. 38, 40-42, 48, 49, 53, 131, and 144.

### The Involvement of MTT9, SAEG, SECAP, and SACAP in the TD Scheme

48. The Traders Domain fraudulent scheme was facilitated by various third-party entities that were organized and controlled by Tin Quoc Tran ("Tran"), including, among other entities, MTT9, SAEG, SECAP, and SACAP.

49. Traders Domain customers were directed to deposit funds into the MTT9, SAEG, SECAP, and SACAP bank accounts, which were owned and controlled by Tran (the "Tran Bank Accounts"), for purposes of investing into the TD Pool.

50. During the Relevant Period, customers transferred no less than $130 million to the Tran Bank Accounts. None of these funds were ever used for legitimate trading purposes, rather, the Receivership Entities misappropriated such funds for their own benefit.

### False Profits to Defendants

### Defendant FCC

51. A true and correct summary of the transfers from SACAP and SECAP to First Class Consulting (the "FCC Transfers"), which details the specific maker of each Transfer, the dates and

---

**COMPLAINT**                                                                 **PAGE 12**

amounts of all Transfers, as well as the manner in which each Transfer was made, is attached as **Exhibit F.** This summary is based on the records currently available to the Receiver but is subject to amendment in the event additional payments to Defendant are revealed through discovery or otherwise.

52.     During the Relevant Period, as shown on Exhibit G, SACAP and SECAP made wire transfers in the amount of **$389,499** to Defendant FCC.  These monies are "FCC's False Profits," and do not represent any profits realized from any trades or investments made for or on behalf of Defendant FCC. Instead, the FCC's False Profits were commingled funds of defrauded investors.

53.     The FCC's False Profits originated from bank accounts controlled by SACAP and SECAP who are in the Receivership Estate.

54.     When the FCC's False Profits were transferred to Defendant FCC, SACAP and SECAP intended to incur, or believed, or reasonably should have believed that they would incur, debts to victims of the Traders Domain Ponzi scheme that would be beyond their ability to pay.

55.     Thus, SACAP and SECAP had the actual intent to delay, hinder, or defraud investors and creditors, and made the payments of the FCC's False Profits to delay, hinder, or defraud investors and creditors.

56.     The Receivership Estate has been damaged significantly as a direct and proximate result of the FCC's False Profits paid to Defendant FCC, as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

---

**COMPLAINT**                                                                 **PAGE 13**

57.    Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, or misappropriated from SACAP and SECAP, as a result of the fraudulent transfers to, and unjust enrichment of, Defendant FCC.

## Defendant HOSEA

58.    A true and correct summary of the transfers from SECAP to Defendant Hosea (the "Hosea Transfers"), which details the specific maker of each Transfer, the dates and amounts of all Transfers, as well as the manner in which each Transfer was made, is attached as **Exhibit G.** This summary is based on the records currently available to the Receiver but is subject to amendment in the event additional payments to Defendant Hosea are revealed through discovery or otherwise.

59.    During the Relevant Period, as shown on Exhibit G, SECAP made wire transfers to in the amount of **$2,501,412** to Defendant Hosea.  These monies are "Hosea's False Profits," and do not represent any profits realized from any trades or investments made for or on behalf of Defendant Hosea. Instead, Hosea's False Profits were commingled funds of defrauded investors.

60.    Hosea's False Profits, in part, originated from bank accounts controlled by SECAP.

61.    When Hosea's False Profits were transferred to Defendant Hosea, SECAP intended to incur, or believed, or reasonably should have believed that it would incur, debts to victims of the Traders Domain Ponzi scheme that would be beyond its' ability to pay.

62.    Thus, SECAP had the actual intent to delay, hinder, or defraud investors and creditors, and made the payment of Hosea's False Profits to delay, hinder, or defraud investors and creditors.

---

**COMPLAINT**                                                                 **PAGE 14**

63.    The Receivership Estate has been damaged significantly as a direct and proximate result of Hosea's False Profits paid to Defendant Hosea, as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

64.    Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, or misappropriated from SECAP as a result of the fraudulent transfers to, and unjust enrichment of, Defendant Hosea.

**Defendant KEVTON**

65.    A true and correct summary of the transfers between SECAP and MTT9 to Defendant Kevton Technologies, LLC ("Kevton") (the "Kevton Transfers"), which details the specific maker of each Transfer, the dates and amounts of all Transfers, as well as the manner in which each Transfer was made, is attached as **Exhibit H.** This summary is based on the records currently available to the Receiver but is subject to amendment in the event additional payments to Defendant Kevton are revealed through discovery or otherwise.

66.    During the Relevant Period, as shown on Exhibit H, SECAP and MTT9 made wire transfers in the amount of **$1,196,594** to Defendant Kevton.  These monies are "Kevton's False Profits," and do not represent any profits realized from any trades or investments made for or on behalf of Defendant Kevton. Instead, Kevton's False Profits were commingled funds of defrauded investors.

67.    Kevton's False Profits, in part, originated from bank accounts controlled by SECAP and MTT9.

---

68.     When Kevton's False Profits were transferred to Defendant Kevton, SECAP and MTT9 intended to incur, or believed, or reasonably should have believed that it would incur, debts to victims of the Traders Domain Ponzi scheme that would be beyond their ability to pay.

69.     Thus, SECAP and MTT9 had the actual intent to delay, hinder, or defraud investors and creditors, and made the payment of Kevton's False Profits to delay, hinder, or defraud investors and creditors.

70.     The Receivership Estate has been damaged significantly as a direct and proximate result of Kevton's False Profits paid to Defendant Kevton, as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

71.     Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, or misappropriated from SECAP and MTT9 as a result of the fraudulent transfers to, and unjust enrichment of, Defendant Kevton.

### Defendant LE

72.     A true and correct summary of the transfers by SECAP to Defendant Le (the "Le Transfers"), which details the specific maker of each Transfer, the dates and amounts of all Transfers, as well as the manner in which each Transfer was made, is attached as **Exhibit I.** This summary is based on the records currently available to the Receiver but is subject to amendment in the event additional payments to Defendant Le are revealed through discovery or otherwise.

73.     During the Relevant Period, as shown on Exhibit I, SECAP made transfers in the amount of **$350,000** to Defendant Le. These monies are "Le's False Profits," and do not represent

---

**COMPLAINT**                                                                 **PAGE 16**

any profits realized from any trades or investments made for or on behalf of Defendant Le. Instead, Le's False Profits were commingled funds of defrauded investors.

74.     Le's False Profits, in part, originated from bank accounts controlled by SECAP.

75.     When Le's False Profits were transferred to Defendant Le, SECAP intended to incur, or believed, or reasonably should have believed that it would incur, debts to victims of the Traders Domain Ponzi scheme that would be beyond its ability to pay.

76.     Thus, SECAP had the actual intent to delay, hinder, or defraud investors and creditors, and made the payment of Le's False Profits to delay, hinder, or defraud investors and creditors.

77.     The Receivership Estate has been damaged significantly as a direct and proximate result of Le's False Profits paid to Defendant Le, as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

78.     Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, or misappropriated from SECAP as a result of the fraudulent transfers to, and unjust enrichment of, Defendant Le.

### Defendant LOWE

79.     A true and correct summary of the transfers by and between Lowe, on the one hand, and SACAP and SECAP on the other hand (the "Lowe Transfers"), is attached hereto as **Exhibit J**, and details the specific maker of the Transfers, the date and amount of the Transfers, as well as the manner in which the Transfers were made. This summary is based on the records currently available to the Receiver but is subject to amendment in the event additional payments to Defendant Lowe are revealed through discovery or otherwise.

80.    During the Relevant Period, as shown on Exhibit J, Lowe transferred $233,500 to SACAP and SECAP.  SECAP transferred $329,840 to Lowe, so that Lowe received **$96,340** more than he transferred to SACAP and SECAP.  These monies are "Lowe's False Profits," and do not represent any profits realized from any trades or investments made for or on behalf of Defendant Lowe. Instead, Lowe's False Profits were commingled funds of defrauded investors.

81.    Lowe's False Profits, in part, originated from a bank account controlled by SECAP.

82.    When Lowe's False Profits were transferred to Defendant Lowe, SECAP intended to incur, or believed, or reasonably should have believed that it would incur, debts to victims of the Traders Domain Ponzi scheme that would be beyond its ability to pay.

83.    Thus, SECAP had the actual intent to delay, hinder, or defraud investors and creditors, and made the payments of Lowe's False Profits to delay, hinder, or defraud investors and creditors.

84.    The Receivership Estate has been damaged significantly as a direct and proximate result of Lowe's False Profits paid to Defendant Lowe, as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

85.    Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, or misappropriated from SECAP as a result of the fraudulent transfers to, and unjust enrichment of, Defendant Lowe.

**COMPLAINT**                                                                    **PAGE 18**

**Defendant HO**

86.    A true and correct summary of the transfers by SECAP to Ho (the "Ho Transfers"), is attached hereto as **Exhibit K**, and details the specific maker of the Transfers, the date and amount of the Transfers, as well as the manner in which the Transfers were made. This summary is based on the records currently available to the Receiver but is subject to amendment in the event additional payments to Defendant Ho are revealed through discovery or otherwise.

87.    During the Relevant Period, as shown on Exhibit K, SECAP transferred **$131,000** to Ho. These monies are "Ho's False Profits," and do not represent any profits realized from any trades or investments made for or on behalf of Defendant Ho. Instead, Ho's False Profits were commingled funds of defrauded investors.

88.    Ho's False Profits, in part, originated from a bank account controlled by SECAP.

89.    When Ho's False Profits were transferred to Defendant Ho, SECAP intended to incur, or believed, or reasonably should have believed that it would incur, debts to victims of the Traders Domain Ponzi scheme that would be beyond its ability to pay.

90.    Thus, SECAP had the actual intent to delay, hinder, or defraud investors and creditors, and made the payments of Ho's False Profits to delay, hinder, or defraud investors and creditors.

91.    The Receivership Estate has been damaged significantly as a direct and proximate result of Ho's False Profits paid to Defendant Ho, as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

92.     Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, or misappropriated from SECAP as a result of the fraudulent transfers to, and unjust enrichment of, Defendant Ho.

### Defendant NGUYEN

93.     A true and correct summary of the transfers by and between Nguyen, on the one hand, and SACAP and SECAP, on the other hand (the "Nguyen Transfers"), is attached hereto as **Exhibit L**, and details the specific maker of the Transfers, the date and amount of the Transfers, as well as the manner in which the Transfers were made. This summary is based on the records currently available to the Receiver but is subject to amendment in the event additional payments to Defendant Nguyen are revealed through discovery or otherwise.

94.     During the Relevant Period, as shown on Exhibit L, Nguyen invested $80,000 with MTT9, and received transfers of $341,435 from SACAP and SECAP.  Nguyen received **$261,435** more than he invested.  These monies are "Nguyen's False Profits," and do not represent any profits realized from any trades or investments made for or on behalf of Defendant Nguyen. Instead, Nguyen's False Profits were commingled funds of defrauded investors.

95.     Nguyen's False Profits, in part, originated from a bank account controlled by SECAP or SACAP.

96.     When Nguyen's False Profits were transferred to Defendant Nguyen, SACAP and SECAP intended to incur, or believed, or reasonably should have believed that they would incur, debts to victims of the Traders Domain Ponzi scheme that would be beyond their ability to pay.

97.     Thus, SACAP and SECAP had the actual intent to delay, hinder, or defraud investors and creditors, and made the payments of Nguyen's False Profits to delay, hinder, or defraud investors and creditors.

98.     The Receivership Estate has been damaged significantly as a direct and proximate result of Nguyen's False Profits paid to Defendant Nguyen, as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

99.     Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, or misappropriated from SACAP or SECAP as a result of the fraudulent transfers to, and unjust enrichment of, Defendant Nguyen.

### Defendant CHOOSE TO WIN

100.     A true and correct summary of the transfers by and between Choose to Win, on the one hand, and SECAP, on the other hand (the "Choose to Win Transfers"), is attached hereto as **Exhibit M**, and details the specific maker of the Transfers, the date and amount of the Transfers, as well as the manner in which the Transfers were made. This summary is based on the records currently available to the Receiver but is subject to amendment in the event additional payments to Defendant Choose to Win are revealed through discovery or otherwise.

101.     During the Relevant Period, as shown on Exhibit M, Choose to Win invested $400,000 with SECAP, and received transfers of $756,800 from SECAP. Choose to Win received **$356,800** more than it invested. These monies are "Choose to Win's False Profits," and do not represent any profits realized from any trades or investments made for or on behalf of Defendant Choose to Win. Instead, Choose to Win's False Profits were commingled funds of defrauded investors.

102.     Choose to Win's False Profits, in part, originated from a bank account controlled by SECAP.

---

**COMPLAINT**                                                                 **PAGE 21**

103.    When Choose to Win's False Profits were transferred to Defendant Choose to Win, SECAP intended to incur, or believed, or reasonably should have believed that it would incur, debts to victims of the Traders Domain Ponzi scheme that would be beyond its ability to pay.

104.    Thus, SECAP had the actual intent to delay, hinder, or defraud investors and creditors, and made the payments of Choose to Win's False Profits to delay, hinder, or defraud investors and creditors.

105.    The Receivership Estate has been damaged significantly as a direct and proximate result of Choose to Win's False Profits paid to Defendant Choose to Win, as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

106.    Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, or misappropriated from SECAP as a result of the fraudulent transfers to, and unjust enrichment of, Defendant Choose to Win.

### Defendant THE RESERVE

107.    A true and correct summary of the transfer by MTT9 to The Reserve (the "Reserve Transfers"), is attached hereto as **Exhibit N**, and details the specific maker of the Transfer, the date and amount of the Transfer, as well as the manner in which the Transfer was made. This summary is based on the records currently available to the Receiver but is subject to amendment in the event additional payments to Defendant The Reserve are revealed through discovery or otherwise.

108.    During the Relevant Period, as shown on Exhibit N, The Reserve received a transfer of **$240,000** from MTT9. These monies are "The Reserve's False Profits," and do not represent

any profits realized from any trades or investments made for or on behalf of Defendant The Reserve. Instead, The Reserve's False Profits were commingled funds of defrauded investors.

109. The Reserve's False Profits originated from a bank account controlled by MTT9.

110. When The Reserve's False Profits were transferred to Defendant The Reserve, MTT9 intended to incur, or believed, or reasonably should have believed that it would incur, debts to victims of the Traders Domain Ponzi scheme that would be beyond its ability to pay.

111. Thus, MTT9 had the actual intent to delay, hinder, or defraud investors and creditors, and made the payment of The Reserve's False Profits to delay, hinder, or defraud investors and creditors.

112. The Receivership Estate has been damaged significantly as a direct and proximate result of The Reserve's False Profits paid to Defendant The Reserve, as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

113. Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, or misappropriated from MTT9 as a result of the fraudulent transfers to, and unjust enrichment of, Defendant The Reserve.

### Defendant TINMAN

114. A true and correct summary of the transfers by SECAP and MTT9 to Tinman (the "Tinman Transfers"), is attached hereto as **Exhibit O**, and details the specific maker of the Transfer, the date and amount of the Transfer, as well as the manner in which the Transfer was made. This summary is based on the records currently available to the Receiver but is subject to

amendment in the event additional payments to Defendant Tinman are revealed through discovery or otherwise.

115.    During the Relevant Period, as shown on Exhibit O, Tinman received transfers of **$5,600,000** from SECAP and MTT9.  These monies are "Tinman's False Profits," and do not represent any profits realized from any trades or investments made for or on behalf of Defendant Tinman. Instead, Tinman's False Profits were commingled funds of defrauded investors.

116.    Tinman's False Profits originated from bank accounts controlled by SECAP and MTT9.

117.    When Tinman's False Profits were transferred to Defendant Tinman, SECAP and MTT9 intended to incur, or believed, or reasonably should have believed that they would incur, debts to victims of the Traders Domain Ponzi scheme that would be beyond their ability to pay.

118.    Thus, SECAP and MTT9 had the actual intent to delay, hinder, or defraud investors and creditors, and made the payment of Tinman's False Profits to delay, hinder, or defraud investors and creditors.

119.    The Receivership Estate has been damaged significantly as a direct and proximate result of Tinman's False Profits paid to Defendant Tinman, as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

120.    Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, or misappropriated from SECAP and MTT9 as a result of the fraudulent transfers to, and unjust enrichment of, Defendant Tinman.

**COMPLAINT**                                                                                         **PAGE 24**

**Defendant NEW AGE**

121. A true and correct summary of the transfers by and between New Age, on the one hand, and SECAP, on the other hand (the "New Age Transfers"), is attached hereto as **Exhibit P**, and details the specific maker of the Transfer, the date and amount of the Transfer, as well as the manner in which the Transfer was made. This summary is based on the records currently available to the Receiver but is subject to amendment in the event additional payments to Defendant New Age are revealed through discovery or otherwise.

122. During the Relevant Period, as shown on Exhibit P, New Age invested $15,000 with SAEG, and New Age received transfers from SECAP of $286,007. New Age received **$271,007** more than it invested. These monies are "New Age's False Profits," and do not represent any profits realized from any trades or investments made for or on behalf of Defendant New Age. Instead, New Age's False Profits were commingled funds of defrauded investors.

123. New Age's False Profits originated from a bank account controlled by SECAP.

124. When New Age's False Profits were transferred to Defendant New Age, SECAP intended to incur, or believed, or reasonably should have believed that it would incur, debts to victims of the Traders Domain Ponzi scheme that would be beyond its ability to pay.

125. Thus, SECAP had the actual intent to delay, hinder, or defraud investors and creditors, and made the payment of New Age's False Profits to delay, hinder, or defraud investors and creditors.

126. The Receivership Estate has been damaged significantly as a direct and proximate result of New Age's False Profits paid to Defendant New Age, as alleged above. Such damages include, but are not limited to, losses due to the dissipation of customer funds for which no

reasonably equivalent value was provided and other and further compensatory and consequential damages.

127.    Accordingly, the Receiver brings the instant action in order to collect monies that were improperly transferred, dissipated, or misappropriated from SECAP as a result of the fraudulent transfers to, and unjust enrichment of, Defendant New Age.

## CLAIMS FOR RELIEF

## COUNT I

**(Fraudulent Transfer under § 24.005(a)(1), Tex. Bus. & Com. Code Ann.,
Texas Uniform Fraudulent Transfer Act)**

128.    Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 127 of this Complaint as if fully set forth herein.

129.    FCC's False Profits, Hosea's False Profits, Kevton's False Profits, Le's False Profits, Lowe's False Profits, Ho's False Profits, Nguyen's False Profits, Choose to Win's False Profits, The Reserve's False Profits, Tinman's False Profits, and New Age's False Profits are collectively referred to herein as "False Profits".

130.    This is a claim to avoid and recover fraudulent transfers pursuant to Section 24.005(a)(1) Tex. Bus. & Com. Code Ann.

131.    As detailed above, the Receivership Entities transferred the False Profits to the Defendants from a fraudulent and/or Ponzi scheme as described by the CFTC in its CFTC Complaint in the CFTC Action.

132.    The Receivership Entities had the actual intent to delay, hinder, or defraud creditors in transferring the False Profits to the Defendants, and transferred the False Profits to delay, hinder,

or defraud creditors. Consequently, the False Profits paid to the Defendants, were inherently fraudulent.

133. The Defendants received the False Profits from the Receivership Entities without providing reasonably equivalent value in exchange.

134. At the time that the Receivership Entities paid the False Profits to the Defendants, the Receivership Entities were involved in a fraudulent and/or Ponzi scheme and were engaged in a business or transaction for which the remaining assets of the entities in receivership were unreasonably small in relation to the monies that would be owed to victims of the Traders Domain Ponzi scheme for which the entities in receivership are responsible.

135. Based on the foregoing, when the Receivership Entities paid the False Profits to Defendants, the Receivership Entities intended to incur, or believed, or reasonably should have believed, that they would incur debts beyond their ability to pay them as they became due.

136. At the time the Receivership Entities paid the False Profits to the Defendants, the Receivership Entities removed and/or concealed the False Profits from the reach of their investors and/or creditors.

137. Because the False Profits transferred to the Defendants were fraudulent under Tex. Bus. & Com. Code Ann. Section 24.005(a)(1), the Receiver may avoid the False Profits pursuant to Section 24.008(a)(1).

138. As a direct and proximate result of the fraudulent False Profits transferred to Defendants, the Receivership Estate has been diminished in the amount of the False Profits, and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the customers and creditors who were defrauded by the Receivership Entities.

---

## COUNT II

### (Fraudulent Transfer under § 24.005(a)(2), Tex. Bus. & Com. Code Ann., Texas Uniform Fraudulent Transfer Act)

139.    Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 138 of this Complaint as if fully set forth herein.

140.    This is a claim to avoid and recover fraudulent transfers pursuant to section 24.005(a)(2), Tex. Bus. & Com. Code Ann.

141.    As detailed above, the Receivership Entities transferred the False Profits to Defendants from a fraudulent and/or Ponzi scheme.

142.    As detailed above, Defendants received the False Profits from the Receivership Entities without providing reasonably equivalent value in exchange.

143.    The Receivership Entities did not receive reasonably equivalent value in exchange for the False Profits paid to Defendants, as detailed above.

144.    At the time the Receivership Entities transferred the False Profits to Defendants, the Receivership Entities were operating a fraudulent and/or Ponzi scheme, were insolvent, and were engaged in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction.

145.    The Receivership Entities transferred the False Profits to Defendants in furtherance of a fraudulent and/or Ponzi scheme, as described by the CFTC in its CFTC Complaint in the CFTC Action.

146.    At the time the Receivership Entities transferred the False Profits to Defendants, the Receivership Entities removed and/or concealed their assets from the reach of investors and/or creditors related to the Traders Domain scheme.

---

**COMPLAINT**                                                                 **PAGE 28**

147. When the Receivership Entities transferred the False Profits to Defendants, the Receivership Entities intended to incur, or believed, or reasonably should have believed, that they would incur debts beyond their ability to pay them as they became due.

148. Because the False Profits were fraudulent under Section 24.005(a)(2) Tex. Bus. & Com. Code Ann., the Receiver may avoid the False Profits pursuant to Section 24.008(a)(1).

149. As a direct and proximate result of the fraudulent transfer of the False Profits to Defendants, the Receivership Estate has been diminished in the amount of the False Profits and the remaining assets of the Receivership Estate are insufficient to pay the Receivership Estate's debts and liabilities, including, most notably, the claims of the customers and creditors who were defrauded by the Receivership Entities and their principals.

## COUNT III

### (Money Had and Received as to the Transfers)

150. Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 127 of this Complaint as if fully set forth herein.

151. FCC's False Profits, Hosea's False Profits, Kevton's False Profits, See Vee's False Profits, Le's False Profits, Lowe's False Profits, Ho's False Profits, Nguyen's False Profits, Choose to Win's False Profits, The Reserve's False Profits, Tinman's False Profits, and New Age's False Profits are collectively referred to herein as "False Profits".

152. The Receivership Entities conferred a benefit on Defendants when they made the transfer of False Profits to Defendants in the amount of the False Profits set forth above to each Defendant, which were derived from customers of the Receivership Defendants' fraudulent scheme. Accordingly, the Defendants received money that belongs to the Plaintiff.

**COMPLAINT**                                                                 **PAGE 29**

153. The Defendants had knowledge of the benefit they each received from the Receivership Entities as a result of the False Profits and voluntarily accepted and retained the benefit conferred by the False Profits.

154. It is inherently unfair and inequitable that the funds of customers defrauded in the Receivership Defendants' fraudulent scheme are retained by and used to personally benefit Defendants rather than being returned to the Receivership Estate for the benefit of all the defrauded customers. In equity, justice, and good conscience, the funds must be returned from the Defendants to the Plaintiff.

155. As a direct and proximate result of Defendants' retention of the False Profits they each received from the Receivership Entities, the Receivership Estate has been diminished, and, under the circumstances, equity dictates that the Defendants should return the False Profits they received, and any assets they each may have acquired with those funds, to the Receiver for the benefit of all of the defrauded investors.

## ATTORNEYS FEES

156. Plaintiff seeks recovery of reasonable and necessary attorneys' fees and costs as statutorily authorized under Section 24.013 Tex. Bus. & Com. Code Ann.

## PRAYER

WHEREFORE, Plaintiff, Kelly M. Crawford, as Receiver, respectfully requests the Court enter judgment against Defendants: (1) determining that the transfer of the False Profits to Defendants were fraudulent and avoid the False Profits; (2) determining that Defendants were unjustly enriched by virtue of their receipt of the False Profits; (3) entering a money judgment against Defendants, in the full amount of the False Profits received by each Defendant as shown herein, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other

**COMPLAINT**                                                                 **PAGE 30**

assets traceable to such False Profits; (4) awarding Plaintiff damages, costs, reasonable and necessary attorneys' fees, and interest; and (5) granting such other and further relief as may be just and proper.

Respectfully submitted,

SCHEEF & STONE, LLP

By:  /s/ Peter Lewis
PETER LEWIS
State Bar No. 12302100
peter.lewis@solidcounsel.com
500 North Akard, Suite 2700
Dallas, Texas 75201
(214) 706-4200 Telephone
(214) 706-4242 Facsimile

**ATTORNEYS FOR PLAINTIFF
KELLY CRAWFORD, IN HIS CAPACITY AS
RECEIVER**